2011 ME 64

**TOWN OF LEVANT**

v.

**Lawrence A. TAYLOR et al.**

Supreme Judicial Court of Maine.

Submitted on Briefs: Feb. 24, 2011.

Decided: May 31, 2011.

Joseph L. Ferris, Esq., Brewer, ME, for Lawrence A. Taylor and Donald C. Taylor.

David F. Szewczyk, Esq., Bangor, ME, for the Town of Levant.

Panel: ALEXANDER, LEVY, SILVER, MEAD, GORMAN, and JABAR, JJ.

Majority: LEVY, SILVER, MEAD, GORMAN, and JABAR, JJ.

Dissent: ALEXANDER, J.

LEVY, J.

[¶ 1] Lawrence A. Taylor and Donald C. Taylor appeal from a judgment of the District Court (Newport, *Sparaco, J.*) concluding that they violated the Town of Levant's Land Use Ordinance and awarding civil penalties, costs, and attorney fees in the Town's action brought pursuant to M.R. Civ. P. 80K and 30-A M.R.S. § 4452 (2010). The Taylors contend that they cannot be held responsible for a land use violation resulting from actions taken on their land by a third party. We affirm the judgment.

## I. CASE HISTORY

[¶ 2] The facts in this case are largely not in dispute. At all times relevant to this case, the Taylors owned a lot in the Town of Levant. They were negotiating to sell the lot to a third person, Timothy Linnell. At some point, Linnell parked a mobile home on the Taylors' lot. The court found that Linnell was "storing" the mobile home on the lot pending a sale of the lot to him. While parked on the lot, the mobile home sat on a trailer, with tires attached. The mobile home remained unoccupied and was not connected to any plumbing or utilities. There was no evidence of any site work being done on the lot preparatory to placement of the mobile home on a foundation.

[¶ 3] The Town's code enforcement officer (CEO) sent the Taylors a notice dated December 30, 2009, asserting that the placement of the mobile home on the lot was a violation of the Town's land use ordinance. The letter warned, "If this mobile home is not removed this violation will be placed in the hands of the town attorney for legal action." The notice was followed by a letter from the Town attorney dated January 21, 2010, directing the Taylors to cease the violation within fifteen days of the date of the letter. When that letter did not resolve the matter, the Town filed a complaint pursuant to M.R. Civ. P. 80K against the Taylors on March 9, 2010. The complaint alleged that storing the mobile home on the Taylors' lot violated six specific provisions of the Town of Levant's Land Use Ordinance.

[¶ 4] After a hearing, the court entered a detailed judgment in which it found that the Town had failed to prove violations of five of the six articles of the Town's Land Use Ordinance cited in the Town's Rule 80K complaint.[1] The court did find that

---

1. The Town failed to prove violations of: (1) Article 1000, generally requiring permits for buildings or structures to be "constructed," "inhabited," or "used"; (2) Article 1005(A), requiring payment of fees for obtaining permits, which the court found did not constitute

the Taylors violated Article 1010, which requires a CEO permit for "[r]elocating or locating 1 or 2 buildings on to a lot." Article 1010 consists of a table that lists three categories of activities for which there is either "No Permit Required," a "CEO Permit Required," or a "Planning Board Permit & CEO Permit Required." Levant, Me., Land Use Ordinance, art. 1010 (June 23, 2007). Noting that it was addressing a question that we left open in *Your Home, Inc. v. City of Portland*, 432 A.2d 1250, 1258 (Me.1981)—whether a mobile home becomes a building merely by being parked on a lot—the court concluded that the Taylors' mobile home was properly treated as a building for which a permit was required. The court based its conclusion on definitions provided in the Ordinance, reasoning as follows:

> Article 1610 provides that the word "building" includes the word "structure." Article 1620, in turn, expressly states that "mobile homes are structures." Therefore, it follows that mobile homes are buildings under this Ordinance. Accordingly, pursuant to the table set forth in Article 1010 "locating" a mobile home on a lot requires a CEO permit.

[¶ 5]  The court also rejected the Taylors' contention that they had played no role in allowing the mobile home to be moved onto and to remain on their land:

> Even after receiving two letters from the Town charging them with violations as a result of the presence of the mobile home on their land, the Defendants remained silent regarding their alleged lack of culpability.  More importantly, there is no evidence that the Defendants, after having been placed on notice

of the alleged violations occurring on their land, took significant steps to obtain a permit or to have the mobile home legally removed from their land.  Under such circumstances, the court finds that the Defendants can be held liable for allowing the mobile home to remain on the property without a permit.

[¶ 6]  Having found the violation, the court assessed a civil penalty of $2500, plus attorney fees, expert witness fees, and costs. Article 1440 of the Ordinance authorizes fines against a landowner in accordance with 30–A M.R.S. § 4452.  This appeal followed.

## II.  LEGAL ANALYSIS

■  [¶ 7]  We address (A) the Taylors' contention that the court erred because they cannot be held responsible for a violation of Article 1010 caused by a third party and there was no evidence from which the court could infer that they played a role in leaving the mobile home on their property; and (B) the dissenting opinion's contention that the language of Article 1010 does not, itself, establish specific permitting requirements independent of those otherwise specified in Articles 1000 through 1350 of the Ordinance.

### A.  Violation of Article 1010

■  [¶ 8]  We review the court's factual findings for clear error and do not disturb a finding unless there is no competent evidence in the record to support it. *Town of Vassalboro v. Barnett*, 2011 ME 21, ¶ 19, 13 A.3d 784, 790.  We review the court's application of the law to its findings

a separate violation; (3) Article 1020(A), addressing the procedure for applying for a permit, which the court found did not constitute a separate violation; and (4) Article 1020(F), requiring that no building permit be issued unless a plumbing permit had been issued; and

(5) Article 1350, stating required design criteria for mobile homes, which the court found not to have been violated because "the mobile home was being stored and not occupied while on the lot."  Levant, Me., Land Use Ordinance (June 23, 2007).

de novo. *Degenhardt v. EWE Ltd. P'ship,* 2011 ME 23, ¶ 7, 13 A.3d 790, 793.

[¶ 9] The court determined from the evidence presented that the Taylors, as owners of the lot, had notice of the violation and the ability and opportunity to correct the violation but failed to do so. The Taylors received notice of the violation from letters sent by the Town's CEO and the Town's attorney. The two letters provided fourteen days and fifteen days, respectively, for the Taylors to remove the trailer and avoid legal action. The court rejected, as not credible, the Taylors' contention that they played no role in allowing the mobile home to be stored on their lot. The court inferred the contrary because there was no evidence that the Taylors, after receiving notice of the violation, had asked Linnell to remove the mobile home, sought to obtain a proper permit, or otherwise sought to have the mobile home removed from the land. The record evidence supports the court's findings.

[¶ 10] Furthermore, the court did not err in concluding that the Taylors, as landowners, were responsible for the land use violation committed on their property. The violation applies to the Taylors because (1) the Ordinance authorizes fines against the landowner for this violation, Levant, Me., Land Use Ordinance, art. 1440; 30-A M.R.S. § 4452(2) (specifying that "[a]ny person, including, but not limited to, a landowner … who violates" municipal land use ordinances is liable for penalties); (2) they had notice of the violation; (3) they, as landowners, had control over the use of their land; and (4) they had a reasonable opportunity to correct the violation. *See Town of Boothbay v.*

*Jenness,* 2003 ME 50, ¶¶ 17–18, 822 A.2d 1169, 1174–75 (applying a four-factor analysis to conclude that a landlord can be held responsible for a tenant's violation of an ordinance).

**B. Interpretation of Article 1010**

[¶ 11] We next address the dissenting opinion's contention that the language of Article 1010 does not establish a permitting requirement independent of other permitting requirements specified in Articles 1000 through 1350, based on the Ordinance's definition of "mobile home" in Article 1620. This contention was not raised by the Taylors before the District Court and did not factor in the court's analysis. Neither has it been raised by the Taylors in this appeal.

[¶ 12] We review a court's interpretation of a local ordinance de novo. *Barnett,* 2011 ME 21, ¶ 6, 13 A.3d at 786. Article 1010 indicates that a "CEO Permit [is] Required" for "[r]elocating or locating 1 or 2 buildings on to a lot." The Ordinance also specifies that "the word **'building'** includes the word **'structure'**" and that "mobile homes are structures." Levant, Me., Land Use Ordinance, arts. 1610, 1620.

[¶ 13] A "mobile home" is defined by the Ordinance as "[m]anufactured housing which is built on a permanent chassis and designed to be used as a dwelling, with or without permanent foundation, when connected to the required utilities, including plumbing, heating, air conditioning, and electrical systems contained therein." Levant, Me., Land Use Ordinance, art. 1620. The three elements of this definition require that the object be (1) manufactured [2]

---

2. The Ordinance defines "Manufactured" as follows:

A structural unit or housing units designed for occupancy, constructed in a manufacturing facility, and then transported by the

use of its own chassis or placement on an independent chassis to a building site. The term includes any type of building which is constructed at a manufacturing facility and then transported to a building site where it

housing, (2) built on a permanent chassis, and (3) designed for use as a dwelling, with or without a permanent foundation, when connected to the required utilities.

[¶ 14] By reasoning that a mobile home is not a mobile home under the Ordinance until it is *actually* connected to the required utilities, the dissenting opinion treats the design element of the definition as an actual use requirement. The definition in Article 1620, however, does not require that the mobile home be "designed to be used as a dwelling" *and be* "connected to the required utilities." The Ordinance takes a similar approach in its definition of other terms, such as "Camper," [3] "Dwelling Unit," [4] and "Structure," [5] all of which focus on design and intended use, and not on actual use. *See* Levant, Me., Land Use Ordinance, art. 1620. Any doubt as to whether the Ordinance seeks to regulate objects based on their design and intended use, as opposed to their actual use, is clarified in Article 1610, Construction of Language, which provides: "The words 'used' or 'occupied' include the words 'intended,' 'designed,' or 'arranged to be used or occupied.'" Levant, Me., Land Use Ordinance, art. 1610.

The entry is:

Judgment affirmed.

ALEXANDER, J., dissenting.

[¶ 15] Because there is no provision in the Town of Levant Land Use Ordinance that expressly prohibits the temporary parking of an unconnected and unoccupied house trailer on a parcel of land, I respectfully dissent.

[¶ 16] Article 1010 of the Town of Levant Land Use Ordinance is best interpreted as a summary chart outlining the specific permitting requirements of the Ordinance stated in Articles 1000 through 1350. It depicts what actions upon the land in the Town require no permit, what actions require a permit from the CEO, and what actions require both planning board approval and a permit from the CEO, pursuant to the separate individual permitting requirements of the Ordinance.

[¶ 17] Article 1010 immediately follows Article 1000, which states that permits are required before buildings are constructed, inhabited, or used. Notably, the court found no violation of the comprehensive permitting requirement stated in Article 1000 and no violation of any other specific permitting requirement. The court found only a violation of the summary chart in Article 1010.

[¶ 18] We review local interpretations of local ordinances de novo as a question of law. *Aydelott v. City of Portland,* 2010 ME 25, ¶ 10, 990 A.2d 1024, 1026; *Kittery*

is utilized for housing and may be purchased or sold by a dealer in the interim. Levant, Me., Land Use Ordinance, art. 1620 (June 23, 2007).

**3.** "Camper" is defined as: "A vehicle designed to be moved on wheels and intended as a temporary dwelling for travel, recreation and vacation use. This term shall also include travel trailers, camper-trailers, and other short-term shelter vehicles or devices, including tents." Levant, Me., Land Use Ordinance, art. 1620.

**4.** "Dwelling Unit" is defined as: "A room or group of rooms designed and equipped exclu-

sively for use as living quarters for only one family, including provisions for living, sleeping, cooking and eating." Levant, Me., Land Use Ordinance, art. 1620.

**5.** "Structure" is defined as: "Anything constructed or erected, except a fence or boundary wall, the use of which requires permanent location on the ground or permanent attachment to something on the ground. Signs, satellite dishes, and mobile homes are structures." Levant, Me., Land Use Ordinance, art. 1620.

*Retail Ventures, LLC v. Town of Kittery,*
2004 ME 65, ¶ 10, 856 A.2d 1183, 1188. In
this review, we examine the ordinance for
its plain meaning and "construe its terms
reasonably in light of the purposes and
objectives of the ordinance and its general
structure." *Stewart v. Town of Sedgwick,*
2002 ME 81, ¶ 6, 797 A.2d 27, 29.

[¶ 19] Article 1010 is placed between
Article 1000 and the next numbered arti-
cle, Article 1005. It appears to have been
a later amendment to the Ordinance,
placed immediately after Article 1000 to
summarize those activities that require
permitting pursuant to Article 1000 and
subsequent articles between 1005 and
1350, describing specific permitting re-
quirements, fees and processes. However,
the language of Article 1010 does not, it-
self, establish specific permitting require-
ments independent of those specified in
Articles 1000 through 1350.

[¶ 20] The court found no violation
proved of any of the specific permitting
requirements of articles that the Town al-
leged were violated between Article 1000
and Article 1350. De novo review of Arti-
cles 1000 through 1350 indicates none that
would apply to a mobile home parked on a
lot while remaining on its mobile home
trailer, when the mobile home is not occu-
pied or used for any purpose or connected
to plumbing or any other utilities, and no
site work is being done to prepare the lot
for placement of the mobile home on the
lot.

[¶ 21] A "mobile home" that would re-
quire a permit is defined in Article 1620 of
the Town Ordinance. The definition of
mobile home is "[m]anufactured housing
which is built on a permanent chassis and
designed to be used as a dwelling, with or
without permanent foundation, *when con-
nected to the required utilities, including*

*plumbing, heating, air conditioning, and
electrical systems contained therein.*"
(Emphasis added).

[¶ 22] The definition of "mobile home"
in Article 1620, by its terms, excludes the
parked, unoccupied, unused, and uncon-
nected mobile home at issue here from the
several permitting requirements applicable
to occupied and connected mobile homes.

[¶ 23] The term "locating" in Article
1010 is ambiguous as to whether it may
include temporary parking of a mobile
home, or anything else, on a property.
However, when read in the context of the
specific permitting requirements of the Or-
dinance that the court found not to be
violated, including the general permitting
requirement in Article 1000, the term "lo-
cating" in Article 1010 must be construed
not to extend to the temporary parking of
a mobile home on a lot as occurred in this
case. Ordinances must be construed by
looking at the entire context and structure
of the ordinance, including related sec-
tions. *See Stewart,* 2002 ME 81, ¶ 6, 797
A.2d at 29.

[¶ 24] So construed, the court erred in
concluding that the parking or storing ac-
tivity in this case required a code enforce-
ment officer permit and that the lack of
such a permit constituted a violation of
Article 1010. Accordingly, I would vacate
the District Court's judgment and the
nearly $12,000 it awarded pursuant to 30–
A M.R.S. § 4452 (2010) as penalties, fees,
and costs for temporarily parking this mo-
bile home.