STATE OF MAINE  
KENNEBEC, ss.

SUPERIOR COURT  
CIVIL ACTION  
DOCKET NO. AP-18-06

WASHINGTON COUNTY, et al. and )
)
      Petitioners, )
)
and )
)
JANET T. MILLS, in her official capacity )
as Attorney General of Maine )
)
and )
)
AMERICAN FEDERATION OF STATE, )
COUNTY, and MUNICIPAL )
EMPLOYEES, DISTRICT COUNCIL 93, )
)
and )
)
MAINE STATE EMPLOYEES )
ASSOCIATION, LOCAL 1981, )
)
      Intervenors )
v. )
)
JOSEPH FITZPATRICK, in his official )
capacity as the Commissioner of the Maine )
Department of Corrections, )
)
      Respondent. )

**ORDER ON MOTIONS FOR  
PRELIMINARY INJUNCTION**

Before the Court are preliminary injunction motions brought by Intervenors the Attorney General and American Federation of State, County, and Municipal Employees, District Council 93, and Maine State Employees Association, Local 1981, and joined by Plaintiffs Washington County and Town of Machiasport.

1

I.    Background

The Downeast Correctional Facility ("DCF") is a minimum security prison located in Machiasport, Washington County, Maine. In 1984, it was established by statute: "There is established the Downeast Correctional Facility located in Washington County for the confinement and rehabilitation of persons who have been duly sentenced and committed to the Department of Corrections." 34-A M.R.S. § 3901. According to the statute, the purposes of the facility include "vocational and academic education and work which may involve public restitution." 34-A M.R.S. § 3902. In the biennial budget signed by the Governor on July 3, 2017, funds were provided for operation of the DCF through June 2018. In December 2017, members of the Legislature introduced emergency legislation directed towards funding the DCF for the fiscal year ending June 30, 2019. *See* L.D. 1704. The Committee on Criminal Justice and Public Safety voted unanimously in favor of the funding of DCF on February 5, 2018.

Approximately four days later, at about 4:30 am on February 9, 2018, the DOC, with help from the Maine State Police, arrived at DCF. According to sworn statements from DCF employees, the DOC and Maine State Police were wearing riot gear and were heavily armed. They rounded up all inmates housed at DCF, loaded them onto buses, and transported them to DOC's other prisons. That same day, DOC issued all 55 DCF employees termination notices that stated "I regret to advise you that Downeast Correctional Facility is scheduled for closure. Therefore, your position in the Department of Corrections will be eliminated, and you will be laid-off from your Correctional Officer position effective March 3, 2018. You are being placed on administrative leave with pay for ten scheduled workdays, beginning February 9, 2018."

2

In response to the events of February 9, the Governor gave the following statement which is referred to in the record before the Court: "As I sit here today, I have a jail that costs more to operate than the maximum security prison in the state of Maine... The Legislature did not fund it for the total two-year biennial and at some point it was going to close and I saw today as an ability to save the state a little bit more money and to help the Legislature fund Medicaid expansion which passed in November. So thank you very much."

On February 13, Plaintiffs Washington County and Town of Machiasport filed a Complaint for Review of Governmental Action Pursuant to M.R. Civ. P. 80B with Independent Claim for Relief and Ex Parte Motion for Temporary Restraining Order. The Court denied Plaintiff's Motion for an ex parte temporary restraining order and held a hearing on February 14, 2018, after notice was served upon Defendant Joseph Fitzpatrick in his official capacity as Commissioner of the Department of Corrections. The Attorney General and the unions that represent the DCF employees: American Federation of State, County, and Municipal Employees, District Council 93, and Maine State Employees Association, Local 1981; moved to intervene. Both the Attorney General and the Unions filed motions for a preliminary injunction.

On February 15, 2018, the Legislature voted to continue funding for the DCF into 2019.

The Court heard argument on motions brought to intervene by the Attorney General and the Unions, as well as argument on the motions for preliminary injunction, on March 5, 2018. Defendant did not object to the Attorney General and Unions entering the case through permissive intervention. The Court granted intervention by the Attorney General and the Unions on that date.

The Plaintiffs' Motion for Temporary Restraining Order sought an order of the Court requiring the DOC to keep DCF operational and to cease any dismantling of the physical facility.

3

Plaintiffs and Defendant reached an agreement prior to the February 14 hearing by which Defendant would issue a letter agreement. The letter, signed by Deputy Commissioner Ryan Thornell on February 14, 2018, states that neither he nor his agents will take any action with regards to DCF to:

> demolish the Facility; remove equipment or machinery from the Facility; disconnect, disassemble, dismantle, destroy, damage, or otherwise render inoperable any equipment, machinery, or other property currently within the Facility; disconnect, disassemble, turn off, or otherwise render inoperable any of the heating, ventilation, air conditioning, electrical, or plumbing systems within the Facility; or discontinue any regular maintenance of the Facility which may be necessary to preserve the safety and/or current condition of the Facility.

Defendant has agreed to extend the letter agreement to the earlier of the resolution of the current case or the end of funding on June 30, 2018. Plaintiffs do not seek further remedy on the Motion for Temporary Restraining Order.

The Court now considers the two pending motions for preliminary injunction as brought by the Attorney General and the unions, both seeking to restore DCF to operation. Counsel for the Plaintiffs stated at oral argument that they join in these motions.

II.     Standard of Review

In order for the Court to grant a motion for preliminary injunction, the moving party must show the following four criteria:

(1) that plaintiff will suffer irreparable injury if the injunction is not granted, (2) that such injury outweighs any harm which granting the injunctive relief would inflict on the defendant, (3) that plaintiff has exhibited a likelihood of success on the merits (at most, a probability; at least, a substantial possibility), and (4) that the public interest will not be adversely affected by granting the injunction.

*Ingraham v. University of Maine at Orono*, 441 A.2d 691, 693 (Me. 1982); *Bangor Historic Track, Inc. v. Department of Agriculture*, 2003 ME 140, ¶ 9, 837 A.2d 129, 132.

4

III. Discussion

The Court analyzes the Motions for Preliminary Injunction together.

A. Irreparable Harm

The Plaintiffs, the Attorney General, and the Unions cite to the dismantling of the facility, the loss of income to the employees, and the loss of jobs and workers to the community as ongoing irreparable harms resulting from the DOC's actions. As noted above, the DOC has provided a letter agreeing not to dismantle the building pending the earlier of the Court's determination or the end of June. Consequently, there is no ongoing irreparable harm to the physical facility. However, the employees are no longer receiving paychecks and their medical benefits will expire very soon. Furthermore, the community is suffering not only from the employees' loss of work and inability to patronize local business, but also from the loss of inmate labor at local businesses. The Court finds that there is ongoing irreparable injury.[1]

B. Likelihood of Success

In order for a preliminary injunction to issue, the moving party must also show that there is likelihood of success on the merits. *See Bangor Historic Track,* 2003 ME 140, ¶ 9. Where the moving party seeks a court order mandating that the nonmoving party take action rather than cease action, the moving party must show a clear likelihood of success rather than a reasonable

---

[1] The Defendant argues that the Attorney General has not pled sufficient particularized injury to seek the extraordinary relief of a preliminary injunction. *Lindemann v. Comm'n on Governmental Ethics & Election Practices,* 2008 ME 187, P14, 961 A.2d 538, ("Only a 'person who is aggrieved by final agency action shall be entitled to judicial review.' 5 M.R.S. § 11001(1). "Aggrieved," while not defined in MAPA, has been previously defined by this Court as requiring particularized injury--that is, the agency action or inaction must operate 'prejudicially and directly upon the party's property, pecuniary or personal rights.' In addition, we have required that the particularized injury be distinct from any injury experienced by the public at large.") The Court finds that the Attorney General's common law powers provide her with standing to bring this action on behalf of those with particularized injury. *Lund v. Pratt,* 308 A.2d 554, 558 (Me. 1973). ("As the chief law officer of the State, he may, in the absence of some express legislative restriction to the contrary, exercise all such power and authority as public interests may, from time to time require, and may institute, conduct, and maintain all such actions and proceedings as he deems necessary for the enforcement of the laws of the State, the preservation of order, and *the protection of public rights.*")

5

likelihood of success. *Department of Environmental Protection v. Emerson*, 563 A.2d 762, 768 ("Because the requested preliminary injunction had mandatory aspects, the [moving party] had to show a clear likelihood of success on the merits, not just a reasonable likelihood.")

The Plaintiffs, the Attorney General, and the Unions all seek review of the decision by the Commissioner and the DOC for violation of statutory provisions and abuse of discretion. According to M.R. Civ. P. 81(c), extraordinary writs, such as mandamus, have been abolished and replaced with M.R. Civ. P. 80B "Review of any action or failure or refusal to act by a governmental agency, including any department, board, commission, or officer, shall be in accordance with procedure prescribed by Rule 80B." M.R. Civ. P. 81(c).

The Superior Court reviews the decision of the fact-finding body in 80B appeals. *Friends of Lincoln Lakes v. Town of Lincoln*, 2010 ME 78, ¶ 9, 2 A.3d 284. The decision is reviewed for errors of law, abuse of discretion, or findings not supported by substantial evidence. *Aydelott v. City of Portland*, 2010 ME 25, ¶ 10, 990 A.2d 1024. The burden of persuasion is born by the party seeking to overturn the decision. *Id.* "We review issues of statutory interpretation de novo with the primary objective of giving effect to the Legislature's intent." *Humboldt Field Research Inst. v. Town of Steuben*, 2011 ME 130, ¶ 5, 36 A.3d 873 (citing *Searle v. Town of Bucksport*, 2010 ME 89, ¶ 8, 3 A.3d 390).

Although there is no conventional Rule 80B record before the Court at this stage, the parties have agreed that these motions be resolved upon the written filings and arguments. The Court had advised the parties that if they wished to have a testimonial hearing the Court would provide one.

The claims brought by the Plaintiffs and the Intervenors ask the Court to find that in closing the DCF, the Commissioner and the DOC violated the provisions of 34-A M.R.S. § 3901

6

and violated the doctrine of separation of powers provided in Article III of the Maine Constitution. Defendant argues that the actions taken by the Commissioner and the DOC were within the Commissioner's statutory duties and powers as laid out in 34-A M.R.S. § 1402(1)-(3)(A):

1. General. The commissioner has general supervision, management and control of the research and planning, grounds, buildings, property, officers, employees and clients of any correctional facility, detention facility or correctional program.
2. Enforcement of laws. The commissioner shall enforce all laws concerning correctional facilities, unless specific law enforcement duties are given by law to other persons.
3. Rules. Rules shall be established as follows.
   A. The commissioner shall establish, in accordance with the Maine Administrative Procedure Act, Title 5, chapter 375, such rules as he determines appropriate or necessary for the care and management of the property of all correctional facilities, for the production and distribution of industrial products of the correctional facilities and for the execution of the statutory purposes and functions of correctional facilities or correctional programs.

34-A M.R.S. § 1402(1)-(3)(A).

Defendant also cites to the budget for Fiscal years 2018 and 2019, which provided funding for DCF for 2018, but none for 2019. The appropriations bill stated that this appropriation "[e]liminated all positions related All Other costs as a result of the proposed closing of the Downeast Correctional Facility as of June 30, 2018." Defendant argues that this language should be read as acknowledgement by the legislature that DCF will close by June 30, 2018.

Defendant argues that because the Commissioner has the power to determine how to run the facility and whether to transfer inmates or staff between facilities, the Commissioner has the authority to transfer all inmates out of the facility and to lay off all employees in anticipation of a potential closure on June 30. Defendant claims that as Commissioner he has the duty to manage the facility, and this is how he has chosen to do so. Furthermore, Defendant argues that not all

actions taken by administrative bodies are reviewable, and the Commissioner's use of discretion in carrying out the duties outlined in 34-A M.R.S. § 1402 (2017) are among those that are not reviewable.

The Court finds that there is a critical distinction between the Commissioner's actions taken to close the DCF by removing all inmates with no warning and laying off all DCF employees at 4:30 am on February 9, 2018, and the Commissioner's statutory duties to supervise and manage the facility and programs, which do from time to time justify transferring individual inmates and employees. The Court finds that the Commissioner unilaterally closed DCF for all practical purposes on February 9, 2018. The question before the Court is whether the Commissioner had the authority to do so.

In determining who has the authority to close DCF, the Court looks to the pertinent statutes. Section 3901 specifically states that DCF will be established in Washington County "for the confinement and rehabilitation of persons who have been duly sentenced and committed to the Department of Corrections." 34-A M.R.S. § 3901(2017). The Court finds that the plain language of the statute mandates the existence of a correctional facility in Washington County unless and until the Legislature passes legislation repealing Section 3901.

The Court also looks to the authority conveyed to the DOC by statute. Prior to its dissolution by the legislature, the Board of Corrections had the authority to close correctional facilities. 34-A M.R.S. § 1803 (2008). While the Legislature did pass many of the powers and duties of the Board of Corrections on to the DOC, the Legislature clearly did not delegate the authority to close facilities to the DOC. Additionally, while the language cited by the Defendant from the biennial budget does suggest that there was a proposal to close the DCF by June 30,

8

2018, the very fact that the language states "proposed closing" rather than "closing" suggests that the Legislature had yet to decide whether to close the facility.[1]

Additionally, the Defendant argues that the Executive Branch is not required to spend all money appropriated by the Legislature. In *Butterfield v. DHS*, the Superior Court discussed that very issue, recognizing that the Legislature delegated to the Executive Branch discretion to cut funding where there is a budgetary shortfall. *Butterfield v. DHS*, 1991 Me. Super LEXIS 23 (Super. Ct. January 17, 1991); *See* 5 M.R.S. 1668 (2017). However, the Superior Court in *Butterfield* also found that even where there is a budgetary shortfall, there is a process that must be followed and that there are established limitations to the powers of the Executive Branch in matters of appropriation. *Id.* Even in the case of a budgetary shortfall, then-Superior Court Justice Alexander held that the Executive Branch does not have the authority to entirely end a program. *Id.* In this case, the Legislature has appropriated funding for DCF through June 30. The Court finds that the Commissioner is obligated to operate DCF with the funds appropriated to DCF through the end of the fiscal year. Even though the Commissioner is not obligated to spend every penny allocated to DCF, the Court concludes that the Commissioner may not close a funded facility without legislative action.

Given the statutory language requiring the establishment of DCF in Washington County, the Legislature's decision not to continue to delegate the authority to close facilities to the DOC, and the Legislature's language in the biennial budget, the Court finds that the Legislature's intent

---

[1] Recently, the Law Court held that where the Legislature chooses not to codify language into the existing statutory framework, the Legislature did not intend for the language to carry the same weight as codified language. *Euphrem Manirakiza et al. v. Department of Health and Human Services*, 2018 ME 10, ¶ 12. As in *Manirakiza*, there is a conflict between the plain language interpretation of the allocated language of Section 3901, establishing the facility, and the language found in the biennial budget suggesting that there is a proposal that the facility will close by June 30, 2018. The Court finds that because there is conflict between the two provisions, the language of Section 3901 must be afforded more weight than the language of the biennial budget.

was to retain the authority to decide which facilities should remain operational and which facilities should close. While it is within the Commissioners discretion to determine how to operate the DCF program, only the Legislature has the authority to decide not to fund DCF and rescind the requirements set out in 34-A M.R.S. § 3901. Until then, the Commissioner must manage and supervise DCF in accordance with the statute.

Therefore, the Court finds that the Plaintiff and Intervenors have shown a clear likelihood of success on the merits.

C. Balance of Harms

The Unions and the Attorney General argue that the harm caused to the community and the employees outweighs the harm that would be caused to the Commissioner by an order requiring the Commissioner to reopen DCF. The Commissioner argues that he would be significantly harmed by a court order that took away his discretion. The Court finds that the Commissioner would not be significantly harmed by a court order requiring him to perform the duties outlined by statute. Therefore, the Court finds that the Unions and the Attorney General have made a showing their injury outweighs any harm which granting the injunctive relief would inflict on the Commissioner and DOC.

D. Public Interest

Finally, Defendant claims that the public interest would be not be served by the issuance of an injunction because it would create uncertainty in the authority of the Commissioner. Alternatively, the Attorney General argues that an injunction would be in the interest of the public because not so issuing would allow the continued violation of the separation of powers doctrine. The Court finds that the public interest would not be harmed by the issuance of a preliminary injunction requiring the Commissioner to act in accordance with statute.

10

E. Remedy

The Unions and the Attorney General have moved the Court to issue an affirmative injunction requiring the Commissioner to return the facility to its condition as of February 8, 2018, rescind all letters to employees notifying them of layoff, and return all inmates housed at the DCF as of February 8, 2018 to the DCF. The Court has concluded that it has the authority to enforce the statute, including to mandate the continued operation of DCF in accordance with 34-A M.R.S. 3901and 3902. However, the details of everyday operation of DCF have been statutorily delegated to the Commissioner by the Legislature. *See* 34-A M.R.S. § 1402. Moreover, courts are not well situated to make determinations concerning the details of everyday operation of the DCF and to do so could also violate the separation of powers. "Courts respond to specific claims regarding specific cases. Where there are entitlements, they can be enforced. But policy choices are more appropriately committed to elected Executive and Legislative political leadership. Courts have only a limited and very deferential review of such choice making and priority setting." *Butterfield v. DHS*, 1991 Me. Super LEXIS 23, * 5 (Super. Ct. January 17, 1991). The Court therefore defers to the Commissioner as to operation of the facility, and declines to issue any order regarding implementation and selection of programs, levels of staffing and payment of personnel.

IV.    Conclusion

Based upon the foregoing, the Court finds that the Attorney General and the Unions, as joined by the Plaintiffs, have made a sufficient showing for a preliminary injunction to issue. The Court grants the motions IN PART as follows:

11

The Court orders the Commissioner to operate the DCF in accordance with the language of 34-A M.R.S. 3901 and 3902 until the legislature either acts to repeal 34-A M.R.S. § 3901 or ceases to fund DCF.

The Clerk is directed to incorporate this Order into the docket by reference in accordance with M.R. Civ. P. 79(a).

DATE: 3/14/18

Michaela Murphy
Justice, Superior Court